UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| MAREE YOUNG,<br><br>Plaintiff,<br><br>v.<br><br>AETNA LIFE INSURANCE COMPANY,<br><br>Defendant. | Case No. 24-CV-4611 (PJS/DTS)<br><br><br><br>ORDER |

Frank Cameron Bliss, FIELDS LAW FIRM, and Zachary Schmoll, CLEAR PATH LEGAL, for plaintiff.

Elizabeth G. Doolin, Alexander Verdugo, and Julie F. Wall, CHITTENDEN, MURDAY & NOVOTNY LLC, for defendant.

Plaintiff Maree Young is a former employee of TD Bank, N.A. ("TD Bank") and a participant in TD Bank's long-term disability ("LTD") plan. Young brings this action under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 *et seq*, claiming that defendant Aetna Life Insurance Company ("Aetna") wrongfully terminated her LTD benefits. This matter is before the Court on the parties' cross-motions for summary judgment. For the reasons explained below, the Court denies Young's motion and grants Aetna's.

## I. BACKGROUND

### *A. Employment and Medical History*

TD Bank employed Young as a Senior Business Management Specialist for more than a decade, beginning in 2005. *See* HA 298, 3054. Young worked within the information-technology department to implement programs and strategies designed to optimize resources and increase profits. HA 298, 398–404, 493, 1860–61, 1872–77, 3033. She led teams, solved problems, and juggled deadlines. HA 398–400. Her job was mostly sedentary, but involved occasional standing and walking. HA 298, 404.

In 2014, Young began to experience frequent, debilitating episodes of vomiting. HA 494–97, 583. At her worst, Young vomited up to ten times a day, was hospitalized for two weeks, and, at one point, could not retain food for 41 days. HA 107–26, 151, 1870, 2083. In February 2016, Young was hospitalized with kidney failure. HA 584. Eight months later, in October 2016, Young was diagnosed with Cyclic Vomiting Syndrome ("CVS"), a rare disease with no known cause or cure. HA 546, 548–558, 1034, 1870, 2083. Young suffered metabolic brain damage that affected her cognition and was caused or influenced by her CVS. HA 509–15, 584–85, 2083. Her cognitive dysfunction included problems with short-term memory, executive function, balance, and communication. HA 514, 586, 1865. Young also experienced anxiety and depression. HA 514, 585.

*B. Disability-Benefit Claims*

Young is covered under a 2013 LTD policy held by TD Bank and insured by Aetna ("the Plan").[1] HA 3785. A claimant meets the Plan's "test of disability" when she "cannot perform the material duties of [her] own occupation solely because of an illness [or] injury . . . and [her] earnings are 80% or less of [her] adjusted predisability earnings." HA 3791.[2] A claimant's "own occupation" is the job she is "routinely performing when [a] period of disability begins." HA 3806. The Plan provides that LTD benefits end on the first date on which the participant (1) no longer meets the LTD test of disability, as determined by Aetna; (2) fails to provide proof that she meets the LTD test of disability; or (3) receives an independent medical exam report or functional capacity evaluation that does not, in Aetna's opinion, confirm that she is disabled. HA 3792 (citation modified). The Plan also requires a claimant to "furnish true and correct information as Aetna may reasonably request" to support her claim. HA 3802.

---

[1]The Plan consists of both the policy (group number 818960) and the "certificate" that summarizes the policy and is provided to participants. HA 3785.

Hartford Life and Accident Insurance Company acquired Aetna's group-life and disability-insurance business in November 2017. *See* ECF No. 24 at 2 n.1. For ease of reference, the Court refers to both entities collectively as "Aetna."

[2]The parties agree that their summary-judgment motions can be resolved based on the administrative record, which is cited with the Bates Number prefix "HA" and page number (with leading zeros removed). *See* ECF Nos. 24 at 2 n.2, 40 at 1.

Young stopped working due to her vomiting in February 2016. HA 1081. After paying short-term disability benefits to Young, Aetna approved her claim for LTD benefits in November 2016 (following her CVS diagnosis). HA 1081, 1118.[3] Over the next seven years, Aetna periodically requested proof of eligibility, and Young responded to those requests. HA 1127–39 (Apr. 2017); 1151–52 (May 2017); 1159–60 (June 2017); 1162–63 (Sept. 2017); 1238–42 (Dec. 2017); 1243–44 (Feb. 2019); 1165–1237, 1244–50 (Oct. 2019); 1262–82 (Mar.–May 2020); 1287–1302 (June–July 2020); 1351–61 (Sept. 2021); 1362–72 (Oct. 2022); 1387–97 (Nov. 2022); 1408–70 (June–Sept. 2023).[4]

During its 2023 review, *see* HA 1471, Aetna collected office notes from Dr. Peter Amann and Dr. Karin Doehne; surveillance footage of Young recorded over two days; letters from Dr. Amann, Dr. Doehne, and Psychiatric-Mental Health Nurse Practitioner ("PMH-NP") Lisa Barry; and an Independent Medical Exam ("IME") that Young underwent at Aetna's request and that was conducted by Dr. Howard Jones. The information received by Aetna included the following:

*Dr. Amann*. Aetna reviewed office notes from Dr. Amann's visits with Young through June 2023. HA 1471. Young saw Dr. Amann, a family physician, for services

---

[3]In 2018, the Social Security Administration ("SSA") awarded Young disability benefits dating back to August 2016. HA 2152–56, 3077–87.

[4]Aetna temporarily terminated Young's benefits in January 2023, but reinstated them when it received the information it had requested. HA 1399–1405.

related to weight loss. HA 2342–73. In August 2022, Dr. Amann noted that Young had experienced four CVS episodes since April. HA 2344. In October 2022, Young reported three days with vomiting episodes and five with nausea over the past two months. HA 2358–60. In March 2023, Dr. Amann noted that Young had vomited three times over the past three months, that Young felt "like she has more control," and that Young had not visited an emergency room in "a few years." HA 2367–70. Dr. Amann's notes from June 2023 do not mention any recent CVS episodes. HA 2363–66. In August 2023, when Aetna asked Dr. Amann to opine if Young had "the ability to function" in an occupation for "40 hours per week, primarily seated in nature with occasional walking and standing," Dr. Amann did not answer, but instead deferred to Young's primary-care provider (Dr. Doehne). HA 2314.[5]

*Dr. Doehne.* Dr. Doehne, Young's primary-care physician, began treating Young in 2015. HA 2583. Aetna reviewed notes from some of Young's appointments through August 2023. HA 1471. In January 2023, Dr. Doehne noted that Young vomited three times over the past three months, which required Young to change her schedule five times. HA 1938. In August 2023, Young reported two CVS flare-ups over three months. HA 1929. In response to an August 2023 inquiry from Aetna, Dr. Doehne opined that

[5]The record also contains August 2023 notes from Dr. Amann reporting that Young had two CVS episodes "in several months now," "which is overall less frequent than prior." HA 2004–08.

Young was not capable of work because "[t]here has not overall been a change" and because Young "continues to struggle [with] chronic nausea that is not predictable, as well as cognitive [and] physical difficulties." HA 1947.

*PMH-NP Barry.* Young began seeing Barry in 2022 for psychiatric-medication management. HA 2287. When Aetna reached out to Barry in July 2023, Barry opined that Young has ongoing struggles with "periods of cyclical vomiting, processing issues, depression and cognitive impairment." HA 2287. Barry recommended that Young not return to work in light of "her depression, Processing Disorder and significant short term memory impairment." HA 2287.

*Surveillance.* Surveillance videos captured Young "carrying large bags, operating motor vehicles, reaching, carrying multiple items at once, pushing a shopping cart, reaching for items while shopping, twisting [her] body to put items on a conveyer belt, and loading 12 packs of soda two at a time into [her] vehicle." HA 1471. Young used her cane at times, but, at other times, was "just carrying it." HA 1471.

*Dr. Jones.* In October 2023, Dr. Jones (a physician who is board certified in internal and occupational medicine) conducted an IME of Young. HA 1471–72; 2258–66. Dr. Jones summarized Young's self-reported condition as follows:

> [W]hen she is asymptomatic, such as today, she has what she describes as a bit of mental slowness, but no issues at all. She does carry a cane with her in the event she should become unsteady, but is not today. She states she can

> engage in regular activities of daily living and can for instance carry objects with unlimited weight, but she states she tends to be careful when she does so, so as to avoid triggering any of her nausea and with it, some lightheadedness. The claimant states over the past 6 weeks, she has had some episodes of nausea, sometimes with and without vomiting. The episodes rarely last more than 1 day, though they can. They can last for several hours. She sees a local gastroenterologist and states generally, all in all, she has good days and bad days.

HA 2259. Dr. Jones reviewed Young's records—notably, neuropsychology notes from 2016 and 2017, and a 2020 neuropsychology report describing impairments that "would impact work with a decline in cognitive processing, which was masked a bit due to [Young's] otherwise elevated functional capacity." HA 2260–62.

Based on Dr. Jones's own examination of Young and his review of her medical records, Dr. Jones concluded that "there is no objective evidence at this point upon which to base need for any restrictions in any predictable sense." HA 2264. Dr. Jones reported that Young's CVS episodes are "intermittent," "rarely last more than a day[,] and are uncommon." HA 2264. Although Dr. Jones acknowledged past cognitive difficulties, he opined that "these are very difficult to discern given that [Young] is actively engaged in activities . . . ." HA 2264. Aetna sent the IME to Dr. Amann, Dr. Doehne, and Barry, and invited them to respond. They did not do so. HA 1469–72.

On November 10, 2023, based on its review of all of this information, Aetna concluded that Young was no longer disabled under the Plan and terminated her LTD

benefits. HA 1471–73. Aetna explained to Young that her benefits were being terminated because "there are no signs, symptoms, restrictions, or limitations that would prevent work activities from a physical perspective." HA 1472. As for possible cognitive problems, Aetna reiterated Dr. Jones's finding that any impairment was "very difficult to discern" and noted that Aetna had specifically mentioned in its letter to Barry that it was "not able to evaluate mental nervous or cognitive conditions without medical records to support these claims." HA 1472.[6]

---

[6]After the initial termination but before Young appealed that decision, Barry sent Aetna notes from appointments between March 25, 2022 and November 10, 2023. HA 2223–54, 3758. In March 2022, Barry wrote that Young's CVS was "currently managed." HA 2249. Barry's notes from June 2022 report "[o]ngoing management" of CVS, HA 2246, and her notes from July 2022 do not refer to CVS at all, HA 2244. In September 2022, Barry noted that Young had experienced sleep interruptions due to nausea that may or may not have been caused by CVS. HA 2240. Barry reported in November 2022 that Young had three CVS episodes and six days of nausea over three months, which required Young to change her schedule. HA 2237. In February 2023, Barry noted that, over the past three months, Young had experienced three CVS episodes that lasted "a day or two" (as compared to "several times daily as in the past") and that Young regarded "her current status as a significant improvement." HA 2234. In May 2023, Barry relayed that Young had not vomited over the past month but on two occasions had to reduce her activity level due to nausea. HA 2231. In August 2023, Barry noted that Young had experienced two episodes of vomiting and two of severe nausea, but that her vomiting was "less in frequency." HA 2227–28. In November 2023, Barry's notes indicate that Young had gone two weeks without vomiting following a five-week period in which she vomited on eight days, which was still "less in frequency." HA 2224–25. In addition, Barry disagreed with the IME, noting that CVS "has been debilitating" for Young and "impact[ed] her ability to work." HA 2255–56. Aetna declined to reverse its decision in December 2023. HA 1476.

*C. Appeal*

1. Supplemental Records

Young, through counsel, timely appealed the termination of benefits and offered new records supporting her claim. HA 1893–1906. The new records contained the following information:

*Dr. Doehne.* Dr. Doehne disagreed with the IME, stating that it "would be difficult" for Young to find employment and that Young's "change in cognitive status" would make it impossible for her to maintain the same "level of employment." HA 2210–11. Dr. Doehne also wrote that Young's "condition has improved, but not to her original baseline she was once at. She continues to have slowness that affects the speed at which she can process." HA 2014. According to Dr. Doehne, neuropsychological reports from 2016 confirmed Young's cognitive impairment. HA 2014. Dr. Doehne also completed a functional capacity assessment that stated Young would need breaks from work for "cognitive rest and/or vomiting," may be absent up to four or more days per month due to vomiting, and would be "off task" twenty-five percent or more of each workday. HA 2016–17.

*PMH-NP Barry.* Barry described Young's continued cognitive impairment and complained that the surveillance recordings did not capture Young's "actual hardship and authentic challenges." HA 2053–54. According to Barry, Young would be

"destined to failure" in her own occupation. HA 2053. Barry referred to persistent cognitive difficulties, depression, and anxiety as reasons Young would be "off task" at work. HA 2054.

*Linda Williams.* Linda Williams, a Licensed Clinical Social Worker, began working with Young in September 2022 to develop "strategies to be prepared for unexpected bouts of vomiting" and to manage cognitive difficulties. HA 2151. Williams reported that Young initially expected her cognition to improve, but that it had not—and that Young was no longer "the high functioning, multi-tasking" corporate leader she once was. HA 2151. In Williams's opinion, Young "would be working, if she were able." HA 2151.

*Vocational Report.* Finally, in April 2024, a vocational report was submitted by Tiffany M. Fischer-Blowers, a certified brain-injury specialist, disability-management specialist, vocational evaluator, and LTD specialist. HA 2157–70. Based on a review of Young's records and an interview with Young, Fischer-Blowers concluded that Young was unable to work in her occupation due to continued "memory, attention, and processing changes; communication barriers and losses; vestibular dysfunction; sleep changes and fatigue; and psychological issues." HA 2159. Fischer-Blowers took issue with the IME's conclusion of "no notable disability," emphasizing that cognitive disabilities may be "invisible." HA 2163. She also cited a 2020 neuropsychological

report (commissioned by Aetna) that had found that it was "unlikely that further significant improvement [in Young's cognition] would be anticipated." HA 2163; *see also* HA 1304–16.[7] Fischer-Blowers characterized the 2017 and 2020 neuropyschological evaluations as providing evidence of "clear, supportive, objective, and ultimately quantified cognitive loss." HA 2167.[8]

2. Peer Review

Aetna retained two physicians to independently review Young's supplemental records. First, Dr. Benjamin Basseri, who is board-certified in internal medicine and gastroenterology, concluded that Young was not physically disabled. HA 1497–1506.[9] Dr. Basseri referred to the fact that, in March 2024, Young had reported eight episodes of vomiting in six weeks, two episodes in November, zero in December, and one in January. HA 1502. Dr. Basseri found that no "objective" evidence supported such

[7]The 2020 evaluation, conducted by Dr. Malissa Kraft, found that Young's cognitive dysfunction was persistent and would likely impact "work activities." HA 1307–15. Kraft also described Young's participation in volunteer work, her ability to live independently and perform the tasks of daily living, and her concern that "if she does too well," she might lose her Social Security benefits. HA 1308.

[8]The supplemental records also include Young's job description, HA 1907–09; Young's Social Security benefit-award letter, HA 2152–56; Mayo Clinic records from 2016 and 2017 regarding treatment for CVS and related renal failure and brain injury, HA 2065–96; and neuropsychological reports from 2016 and 2017, HA 2126–32, 2086–92.

[9]Dr. Basseri left two voicemails for Dr. Doehne to discuss Young's status but received no response. HA 1500.

physical impairments as impaired gate, nausea, lightheadedness, severe dehydration, or malnutrition on an "ongoing basis." HA 1502.

Second, Dr. Rujvi Kamat, a neuropsychologist, concluded that Young did not have a disabling cognitive impairment. HA 1487–1495.[10] Dr. Kamat acknowledged Young's purported cognitive difficulties but noted the lack of any neuropsychological evaluation since 2020. HA 1490–94. In Dr. Kamat's opinion, "the totality of the evidence does not substantiate severe observed or quantified cognitive symptoms and impairment in function sufficient to limit work activity." HA 1491.

Aetna sent both independent reviews to Young's treating providers. HA 1510. Dr. Doehne responded that Dr. Kamat had ignored steps that Young takes to prevent CVS episodes—steps that she would be unable to take if she were working at her occupation. HA 1821. Dr. Doehne explained that Young's "mental status has changed" and that testing "showed that she has deficits." HA 1821. Williams also faulted Dr. Kamat for ignoring Young's lack of cognitive skills. HA 1816–17. In response, Dr. Kamat did not alter his conclusion because, he said, there were still "no new clinical findings" or an "updated neuropsychological evaluation." HA 1761–63. Dr. Doehne responded again, objecting that Dr. Kamat's analysis regarding a lack of clinical findings on Young's cognition was "too generic." HA 1636.

[10]Dr. Kamat left two voicemails for Barry but received no response. HA 1490.

Aetna retained yet another medical expert—Dr. Jason Reich, also board-certified in internal medicine and gastroenterology.[11] HA 1512–39. Dr. Reich, like Dr. Basseri, concluded that Young was not physically disabled.[12] HA 1536. Considering "the entire clinical picture," Dr. Reich wrote, "there is no supported level of impairment from a gastroenterological perspective." HA 1536. Dr. Reich cited the absence of "current and ongoing treatment," "ongoing measurable clinical data," and "functional examination tests." HA 1536–37. On August 29, 2024, Young's counsel informed Aetna that she had no further records to submit. HA 3720.

3. Final Termination

In September 2024, Aetna upheld its decision to terminate Young's LTD benefits. HA 1623–25. Embracing the opinions of Drs. Basseri, Kamat, and Reich, Aetna found that no recent, objective test results, data, or clinical findings supported a qualifying physical or cognitive disability. HA 1623–25. Regarding cognition specifically, the letter noted that the most recent neuropsychological report was over three years old. HA 1625. Aetna emphasized that the "presence of a diagnosis or condition alone is not sufficient for approval of benefits." HA 1625. Having exhausted the internal-review

[11]Dr. Basseri was no longer accepting reviews. HA 1624.

[12]Dr. Reich left two voicemails for Dr. Doehne but received no response. HA 1535–36.

process, Young brought this lawsuit, seeking reinstatement of her LTD benefits. Both parties now move for summary judgment.

## II. ANALYSIS

### *A. Standard of Review*

#### 1. Summary Judgment

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute over a fact is "material" only if its resolution might affect the outcome of the lawsuit under the substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

#### 2. ERISA

An ERISA administrator's decision to deny or terminate benefits is reviewed de novo unless the plan grants the administrator discretionary authority to determine eligibility or construe the terms of the plan. *Nichols v. Unicare Life & Health Ins. Co.*, 739 F.3d 1176, 1181 (8th Cir. 2014). Young's Plan grants such discretion to Aetna. *See* HA 3855 (giving Aetna the discretion to "determine whether and to what extent eligible

employees and beneficiaries are entitled to benefits" and providing an abuse-of-discretion standard of review). According to Young, however, a Maine statute trumps the Plan language and takes away the discretion that the Plan gives to Aetna.

At all times, both TD Bank and Young have been located in Maine, and the Plan was issued in Maine. ECF Nos. 24 at 23, 40 at 5. In 2019, the Maine legislature enacted a statute prohibiting group-health-insurance policies from giving plan administrators absolute discretion. The statute provides:

> A group health insurance policy, contract or certificate, including, but not limited to, a group disability income insurance policy, contract or certificate may not contain a provision purporting to reserve sole or absolute discretion to the insurer to interpret the terms of the contract, to provide standards of interpretation or review, to determine eligibility for benefits, to determine the amount of benefits or to resolve factual disputes. An insurer may not *enforce* a provision in a policy, contract or certificate that was offered, executed, delivered or issued for delivery in [Maine] *and* has been *continued or renewed* by a group policy holder in [Maine] that purports to reserve sole or absolute discretion to the insurer to interpret the terms of the contract, to provide standards of interpretation or review, to determine eligibility for benefits, to determine the amount of benefits or to resolve factual disputes.

Me. Stat. § 2847-V (emphasis added).

The statute is clear that a group-health-insurance policy issued *after* the statute's effective date cannot even *contain* an absolute-discretion clause. A group-health-insurance policy issued *before* the statute's effective date *may* contain an absolute-

discretion clause—and that clause may continue to be enforced after the statute's effective date—unless and until the policy is "continued or renewed by a group policy holder." That is only reasonable. It would be grossly unfair—and probably unlawful—for the Maine legislature to change the terms of an insurance policy retroactively. But if the parties to the policy choose to "continue" or "renew" the policy *after* they have notice of the new statute, there is nothing unfair about applying that statute to the "continued" or "renewed" policy. If an insurer does not want to be bound by a policy without an absolute-discretion clause, then the insurer does not have to "continue" or "renew" any policies in Maine.

Here, the Plan was effective in 2013 and issued in 2014, *see* HA 3785, and Young's claim arose in 2016, *see* HA 1118. Thus, the Maine statute does not apply to the Plan—and the absolute-discretion clause remains enforceable—unless the Plan was "continued" or "renewed" after 2019.[13] Young says that it was because her benefits

[13]Two tangential matters require brief mention:

First, counsel for Young represented at the hearing that the 2019 statute was actually a re-codification of a preexisting statute barring absolute-discretion clauses in group-disability plans. He later conceded, however, that he was mistaken. *See* ECF Nos. 46, 47.

Second, Young cites to a 2020 certificate in support of her argument that the 2019 statute applies to her Plan. Although this certificate is part of the administrative record, *see* HA 37, it is not the certificate that is incorporated into the Plan, *see* HA 3782–3857. Instead, it relates to a different plan (with a different number). There is no evidence

(continued...)

continued to be paid after 2019. But paying benefits under a policy is not the same thing as continuing or renewing the policy. Suppose, for example, that TD Bank purchased one and only one LTD policy from Aetna: a one-year policy that covered calendar year 2016. Suppose that, during 2016, Young became disabled, her claim was approved under the one-year policy, and she began receiving LTD benefits. Aetna would remain obligated to pay those benefits as long as Young remained disabled, even if Aetna never issued, continued, or renewed another LTD policy to TD Bank—or anyone else in Maine—after 2016. Indeed, Aetna would have to continue to pay LTD benefits to Young even if Aetna went out of business in 2017. Obviously, an insurer that *no longer exists* cannot "continue" or "renew" a policy, even if it remains legally obligated to pay benefits under an old policy that was not "continued" or "renewed."

This is fully consistent with the policy reflected in the Maine statute. The Maine legislature applied the statute only to an insurer who makes a decision to issue, continue, or renew a policy *after* the statute took effect and thus *after* the insurer has received fair notice of what provisions it could and could not include in the new, continued, or renewed policy. An insurer who is paying benefits on a claim that was approved before the Maine statute took effect has no choice but to continue to make those payments (as long as the claimant remains disabled). Under these circumstances,

[13](...continued)
that the Plan under which Young received benefits was "renewed" after 2019.

continuing to make benefit payments after the effective date of the Maine statute is not a volitional act; rather, it is mandated by law. To apply the Maine statute in such a situation would be to retroactively change the terms of a bargain—to enforce the insurer's obligation under a policy to pay claims, while depriving the insurer of something it received as consideration for that obligation (the absolute-discretion clause). *Cf. Giberson v. Unum Life Ins. Co. of Am.*, No. 21-CV-0305, 2022 WL 7139763, at *1, *14 (S.D. W. Va. Oct. 12, 2022) (finding that the Maine statute did not apply to a 2004 policy with a 2005 claim); *Walker Earle v. UNUM Life Ins. Co. of Am.*, No. 19-CV-2903, 2020 WL 4434951, at *9 n.16 (C.D. Cal. July 23, 2020) (declining to apply the statute when it was not in effect "during the relevant time period").

For these reasons, the Court finds that the Maine statute does not apply to the Plan and that the Plan's absolute-discretion clause remains enforceable. Aetna's decision to terminate Young's benefits must therefore be upheld if Aetna's decision is supported by substantial evidence in the administrative record. *Govrik v. Unum Life Ins. Co. of Am.*, 702 F.3d 1103, 1108–09 (8th Cir. 2013); *see also Kleinsteuber v. Metro. Life Ins. Co.*, 176 F.4th 1088, 1096 (8th Cir. 2026) ("Evidence is substantial if a reasonable mind might accept it as adequate to support a conclusion." (cleaned up)).

*B. Termination of Benefits*

In arguing that Aetna's decision to terminate her benefits is not supported by substantial evidence, Young points to several things, including: (1) Aetna's dual role as plan administrator and payer of claims, (2) Young's continued receipt of disability benefits from the SSA, (3) Aetna's payment of benefits to Young from 2016 to 2023, and (4) Aetna's crediting the opinions of its retained physicians over those of Young's treating providers. The Court will address each factor in turn.

1. Conflict of Interest

When a plan administrator both evaluates and pays claims, the "dual role" creates a conflict that is a "factor in determining whether the plan administrator has abused its discretion in denying benefits." *Metro. Life. Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008) (citation omitted); *see also Kleinsteuber*, 176 F.4th at 1094. A court may treat the existence of such a conflict as a "tiebreaker," leading the court to find an abuse of discretion when the decision is close. *Metro Life Ins. Co.*, 554 U.S. at 117. But if an insurer takes "active steps to reduce potential bias and to promote accuracy," the conflict "should prove less important (perhaps to the vanishing point)." *Id.* All of this is a bit metaphysical.

Aetna has a conflict, as it both evaluates and pays claims. *See* ECF Nos. 40 at 8, 42 at 5. Moreover, Aetna does not appear to have taken specific steps to guard against

that conflict affecting coverage decisions. *See Metro Life Ins. Co.*, 554 U.S. at 117. At the same time, Young has not been able to explain "how the conflict of interest impacted the claims decision." *Khoury v. Grp. Health Plan, Inc.*, 615 F.3d 946, 954 (8th Cir. 2010). The Court therefore "give[s] the conflict some weight," but not much. *Id.*

2. Social Security Disability Benefits

A determination by the SSA that a claimant is disabled for purposes of federal law does not bind Aetna to make the same decision for purposes of its policy, although the SSA's determination may provide evidence of disability. *See Metro Life Ins. Co.*, 544 U.S. at 118; *Green v. Union Sec. Ins. Co.*, 646 F.3d 1042, 1053 (8th Cir. 2011). The SSA's determination that Young was disabled was made in 2018. As far as the Court is aware, the SSA has not revisited its decision since 2018, and the Court has no reason to believe that the SSA is even aware of the evidence on which Aetna relied in 2023. Thus, the Court gives the SSA's determination that Young is disabled some weight, while also bearing in mind that much could have changed since 2018. *Cf. Green*, 646 F.3d at 1053; *Petroske v. Kohler Co.*, 854 F. Supp. 2d 669, 685 (D. Minn. 2012) ("Because of the five-year time gap between the Social Security Administration determination in 2005 and [insurer's] determination in 2010, as well as the significant change in the information available during that time, the Court does not give the Social Security Administration's determination of disability much weight.").

3. Prior Payment of Benefits

Young relies heavily on the fact that Aetna itself determined that she was disabled in 2016 and, despite revisiting its decision several times, continued to pay LTD benefits to her until 2023. But a prior grant of benefits does not act "forever as an estoppel so that an insurer can never change its mind." *McOsker v. Paul Revere Life Ins. Co.*, 279 F.3d 586, 589 (8th Cir. 2002). Instead, "[a]n insurer may discontinue benefits if new information calls into question the earlier finding of disability, even if the new information relates to a period for which the insurer has already paid benefits." *Werb v. ReliaStar Life Ins. Co.*, No. 13-CV-0669 (PJS/JSM), 2014 WL 2881468, at *9 (D. Minn. June 25, 2014); *accord Walke v. Grp. Long Term Disability Ins.*, 256 F.3d 835, 840 (8th Cir. 2001) ("Nothing in the claims record justified [insurer's] decision that a change of circumstances warranted termination of the benefits it initially granted.").

The issue before the Court is whether substantial evidence supports Aetna's decision that Young was not disabled *in 2023*. The fact that Aetna found that she was disabled *in 2016*—and continued to pay LTD benefits to her until 2023—is certainly relevant evidence. And if the evidence available to Aetna in 2023 was not materially different from the evidence available to Aetna in 2016, that fact would weigh in Young's favor. *McOsker*, 279 F.3d at 589; *Hardy v. Unum Life Ins. Co. of Am.*, No. CV 23-CV-0563 (JRT/JFD), 2024 WL 4043540, at *15 (D. Minn. Sept. 4, 2024) (noting that the weight to be

afforded to a prior grant of benefits "does not shift the burden to [insurer]; it is instead just a consideration" (citing *McOsker*, 279 F.3d at 589)).

Young goes further, though. She argues that, because Aetna approved her claim and paid LTD benefits for seven years, the burden is now on Aetna to prove that her disabling conditions improved, not on her to prove that she is still disabled. ECF No. 43 at 4–5. The Court disagrees. Under the plain language of the Plan, the burden always remains on Young to prove that she is disabled. Aetna is not obligated to "continue paying benefits unless and until there is evidence that [a] condition has improved." *Werb*, 2014 WL 2881468, at *9; *see also Petroske*, 854 F. Supp. 2d at 685 ("*McOsker* refers only to the information available to the insurer—it does not require that the plaintiff's underlying medical condition improve or alter in some significant way." (cleaned up)).[14]

In *Petroske*, Judge Joan N. Ericksen affirmed a termination of benefits after nearly six years of payment. 854 F. Supp. 2d at 690. The applicable policy allowed the insurer to request proof of eligibility, the insurer requested such proof, and the claimant failed

[14]Notably, other district courts reviewing identical Aetna plans have agreed that Aetna need not establish improvement before terminating benefits. *Dening v. Aetna Life Ins. Co.*, No. 21-221, 2022 WL 2706149, at *8 (E.D. Ky. July 12, 2022) ("Evidence of improved condition is simply not required for benefits to end."); *Shedrick v. Marriott Intern., Inc.*, No. 11-820, 2012 WL 601881, at *11 (E.D. La. Feb. 23, 2012) ("The plain meaning of the plan language indicates that [the insured] must continue to satisfy the plan's terms in order to qualify for benefits . . . this language does not impose any duty upon Aetna to affirmatively disprove that [the claimant] is disabled before it may deny his claim.").

to provide such proof. Moreover, the record before the insurer when it began to pay benefits was "significantly different" from the record before the insurer when it terminated benefits. *Id.* at 673, 678–81, 686–87. Thus, Judge Ericksen said she "afforded little weight to [insurer's] previous payment of benefits" and affirmed the termination. *Id.* at 686–87, 689–90.

By contrast, in *Werb*, the undersigned found that an insurer's decision to terminate benefits based on the "*very same medical records*" that were before the insurer when it began paying the benefits was an abuse of discretion. 2014 WL 2881468, at *9; *see also Roehr v. Sun Life Assurance Co. of Can.*, 21 F.4th 519, 526 (8th Cir. 2021) ("[A] plan administrator's reliance on the same evidence to both find a disability and later discredit that disability does not amount to a reliance on substantial evidence." (cleaned up)).

This case is more like *Petroske* than *Werb*. Aetna asked Young to submit updated proof of eligibility, as allowed by the Plan. As discussed below, the information available to Aetna in 2023 differed in material respects from the information available to Aetna in 2016. Thus, the Court takes into account, but ultimately affords little weight to, the fact that Aetna paid LTD benefits to Young from 2016 to 2023.

4. Selective Review

Finally, Young contends that Aetna improperly gave more weight to the opinions of its reviewing physicians than to the opinions of Young's treating providers. Without doubt, however, Aetna and its reviewing physicians repeatedly solicited and reviewed the opinions of Young's treating providers. *See* HA 1623–25; *Delta Family-Care Disability & Survivorship Plan v. Marshall*, 258 F.3d 834, 843 (8th Cir. 2001) (rejecting lower court's finding "that the Plan 'disregarded' the reports of [the claimant's] treating physicians" where "the Plan's final decision letter clearly demonstrates that the Plan did consider those reports"). But having sought and reviewed the opinions of Young's treating physicians, Aetna had the right to disagree with those opinions, so long as it was not acting "arbitrarily" in "refus[ing] to credit . . . reliable evidence." *Black & Decker Disability Plan v. Nord.*, 538 U.S. 822, 825 (2003). As explained below, Aetna's decision to credit the opinions of the reviewing physicians was not arbitrary.

*C. Substantial Evidence*

Finally, the Court turns to the central question in this case: Was Aetna's decision to terminate Young's benefits in 2023 supported by substantial evidence?

1. Physical Condition

In determining whether an insurer lawfully terminated benefits, courts understandably "focus on the events that occurred between the conclusion that benefits were owing and the decision to terminate them." *McOsker*, 279 F.3d at 589 (citation omitted). In this case, the administrative record provides substantial evidence that, between 2016 and 2023, Young's condition markedly improved and the impact of CVS on her life markedly diminished. *E.g.*, HA 2003–08, 2224–25, 2227–28, 2234, 2259. Substantial evidence therefore supports Aetna's conclusion regarding physical disability.

2. Cognitive Condition

Young has been the subject of three neuropsychological evaluations—in 2016, 2017, and 2020—and all found that she had disabling cognitive impairments. HA 2655–65, 1304–16. Young argues that these reports, combined with the opinions provided by her treating providers in 2023, establish that she continues to be disabled on account of her cognitive impairments, even if she is no longer disabled on account of her physical impairments.

The Court has some sympathy for Young's argument, but the Court is required to review Aetna's decision under the substantial-evidence standard, and that standard is highly deferential. As the Eighth Circuit has repeatedly instructed, substantial

evidence means "more than a scintilla but less than a preponderance." *Govrik v. Unum Life Ins. Co. of Am.*, 702 F.3d 1103, 1109 (8th Cir. 2013) (quotation omitted). Unlike *Werb*, this is not a case in which the insurer terminated benefits based on the same information that was available when it granted benefits. *See* 2014 WL 2881468, at *9.

Aetna began paying benefits to Young in 2016. In 2023, Aetna sought proof of Young's continued eligibility, as was its right. Aetna then worked hard to assemble a comprehensive record. Aetna provided Young with at least four opportunities to provide proof that she was still disabled. Aetna hired an investigator to surveil Young and record her daily activities.[15] Aetna also hired Dr. Jones to perform an IME. And Aetna hired three board-certified physicians—Drs. Basseri, Kamat, and Reich—to review Young's medical records. Aetna and the reviewing physicians repeatedly solicited the views of Young's treating providers, sometimes with and sometimes without success. Aetna assembled a lot of information, and Aetna appears to have taken all of that information into account.

Ultimately, Aetna determined that Young had failed to establish that she continues to suffer from cognitive impairments that are so significant as to be disabling. As Aetna pointed out, the most recent neuropsychological report in the administrative

[15]The Court agrees with Young that the information captured on the surveillance recordings is not terribly useful. The fact that Young can shop for groceries says little about her ability to perform the duties of her former occupation.

record was three years old. Aetna put Young on notice that it was "not able to evaluate mental nervous or cognitive conditions without medical records to support these claims." HA 1472. But Young chose not to obtain an updated neuropsychological evaluation.[16] Instead, Young chose to rely on information that was three to seven years old. *E.g.*, HA 1821, 2014–15, 2163–67. On this record, the Court finds that Aetna's conclusion that it lacked "objective evidence concerning [Young's] . . . cognitive capabilities"—that is, her cognitive capabilities *as of 2023*—is "a conclusion that a reasonable mind might accept as adequate." *Hunt v. Metro Life. Ins. Co.*, 425 F.3d 489, 491 (8th Cir. 2005) (cleaned up).

Aetna did not simply rely on the absence of a recent neuropsychological evaluation. It hired Dr. Jones to examine Young, and it hired Dr. Kamat to review the records regarding her cognitive abilities. Both providers told Aetna that no current clinical findings support a diagnosis of cognitive impairment. Obviously, the doctors' opinions—and most of the information on which they relied—were not available to Aetna when it decided to pay LTD benefits to Young in 2016. *See Dillard's Inc. v. Liberty Life Assurance Co. of Bos.*, 456 F.3d 894, 900 (8th Cir. 2006) (concluding that a contrary opinion of a consulting physician constituted a "significant change" supporting a

---

[16]Young complains that Aetna could have commissioned an updated neuropsychological report, as it did in 2020. ECF No. 43 at 5. But the policy puts the burden on Young, not Aetna, to furnish proof of disability. HA 3792.

termination of benefits, even when another consulting physician agreed with the treating physicians). Moreover, Young has not pointed to anything about these doctors' opinions that is "demonstrably incorrect." *See Petroske*, 854 F. Supp. 2d at 688 (distinguishing *Willcox v. Liberty Life Assurance Co. of Bos.*, 552 F.3d 693, 701 (8th Cir. 2009)). True, the reviewing physicians' opinions conflicted with the treating providers' opinions, but "a plan administrator has discretion to choose between two reliable but conflicting medical opinions."[17] *Zaeske v. Liberty Life Assurance Co. of Bos.*, 901 F.3d 944, 948 (8th Cir. 2018) (citing *Delta Family-Care Disability & Survivorship Plan*, 258 F.3d at 843).

In sum, the Court finds that Aetna's decision that Young did not meet her burden to establish that she continued to be disabled in 2023 is supported by substantial evidence in the administrative record.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

---

[17]The Court had some initial concerns about the absence of an explicit comparison of each duty of Young's occupation with her ability to perform that duty. *See McDonough v. Aetna Life Ins. Co.*, 783 F.3d 374, 381–82 (1st Cir. 2015) ("To assess a claimant's ability to perform his own occupation, a decisionmaker must be aware of, and apply, the requirements of the occupation." (citation omitted)). But because substantial evidence supports Aetna's conclusion that Young has not met her burden of proving that she remains disabled because of a lack of recent information about her cognitive condition, the duties of her former occupation are not important.

1. Defendant's motion for summary judgment on the administrative record [ECF No. 23] is GRANTED.

2. Plaintiff's motion for summary judgment [ECF No. 37] is DENIED.

3. Plaintiff's complaint [ECF No. 1] is DISMISSED WITH PREJUDICE AND ON THE MERITS.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: September 24, 2026

/s/ Patrick J. Schiltz
Patrick J. Schiltz
United States District Judge